# In the Iowa Supreme Court

No. 23–1414

Submitted December 17, 2024—Filed May 9, 2025

**League of United Latin American Citizens of Iowa,**

Appellee,

vs.

**Iowa Secretary of State Paul Pate,** in his official capacity; **Iowa Voter Registration Commission; Buena Vista County Auditor Sue Lloyd,** in her official capacity; **Calhoun County Auditor Robin Batz,** in her official capacity; **Jefferson County Auditor Scott Reneker,** in his official capacity; and **Montgomery County Auditor Jill Ozuna,** in her official capacity,

Appellants.

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg, judge.

The respondents appeal a district court ruling dissolving a permanent injunction entered in a different proceeding and entering a declaratory judgment regarding the interpretation of the Iowa English Language Reaffirmation Act. **Reversed and Case Remanded.**

McDonald, J., delivered the opinion of the court, in which all participating justices joined. Waterman and Mansfield, JJ., took no part in the consideration or decision of the case.

Brenna Bird, Attorney General; Leif A. Olson (argued), Chief Deputy Attorney General; Eric H. Wessan, Solicitor General; Patrick C. Valencia, Deputy Solicitor General; and Thomas J. Ogden, Assistant Attorney General (until withdrawal) and Robert M. Livingston and Kristopher K. Madsen of Stuart Tinley Law Firm, Council Bluffs, for appellant.

Uzoma N. Nkwonta (argued), William K. Hancock, and Melinda K. Johnson (until withdrawal) of Elias Law Group LLP, Washington, D.C., and Shayla McCormally of McCormally & Cosgrove, PLLC, Des Moines, for appellee.

W. Charles Smithson, West Des Moines, for amicus curiae Twenty-Six Iowa State Senators.

**McDonald, Justice.**

In the fall of 2021, the League of United Latin American Citizens of Iowa (LULAC) filed a petition against the Iowa Secretary of State, the Iowa Voter Registration Commission, and several county auditors. In its petition, LULAC challenged a permanent injunction and declaratory judgment entered in 2008 in a different case in which LULAC was not a party. In that case, *King v. Mauro*, No. CVCV006739 (Iowa Dist. Ct. for Polk Cnty. Mar. 31, 2008), the Iowa District Court for Polk County permanently enjoined the Iowa Secretary of State and the Iowa Voter Registration Commission from disseminating voter registration forms in languages other than English pursuant to the Iowa English Language Reaffirmation Act. *See* 2002 Iowa Acts ch. 1007 (originally codified at Iowa Code § 1.18 (2003); *id.* § 4.14, now codified as amended at Iowa Code § 1.18 (2021)). According to LULAC, *King* was wrongly decided. In its petition in this case, LULAC sought to dissolve the *King* injunction and sought a declaration that the Act, correctly interpreted, allowed the dissemination of voting materials in languages other than English. In LULAC's view, the enjoined government officials should be freed from the dictates of the erroneous injunction. The district court granted LULAC's requests to dissolve the *King* injunction and for declaratory judgment. The primary question presented in this appeal is whether LULAC has standing to seek to dissolve a thirteen-year-old permanent injunction in a different case and to seek an interpretation of a law that does not cause legal injury to LULAC.

I.

A.

We begin our resolution of this appeal with background regarding the *King* case. In 2002, the Iowa General Assembly passed, and Governor Vilsack signed,

the Iowa English Language Reaffirmation Act. *See id.* The Act explained that "[t]hroughout the history of Iowa and of the United States, the common thread binding individuals of differing backgrounds together has been the English language." *Id.* § 1.18(1)(*b*) (2003). "[T]o encourage every citizen of this state to become more proficient in the English language, thereby facilitating participation in the economic, political, and cultural activities of this state and of the United States, the English language [was] declared to be the official language of the state of Iowa." *Id.* § 1.18(2). The Act regulated the conduct of the government and government officials. It provided that "[a]ll official documents, regulations, orders, transactions, proceedings, programs, meetings, publications, or actions taken or issued . . . by . . . the state and all of its political subdivisions shall be in the English language." *Id.* § 1.18(3). The Act contained a variety of exceptions, including a "rights exception," which provided that the law did not apply to "[a]ny language usage required by or necessary to secure the rights guaranteed by the Constitution and laws of the United States of America or the Constitution of the State of Iowa." *Id.* § 1.18(4)(*h*).

In 2003, then-Iowa Secretary of State Chet Culver began providing voter registration forms online in languages other than English, including Spanish, Vietnamese, Laotian, and Bosnian. Secretary of State Culver's successor, Michael Mauro, continued the practice. The record is unclear as to how many county auditors, who also serve as county commissioners of elections, provided voter registration materials in languages other than English. However, the 2003 Iowa Administrative Code allowed a county commissioner to do so if the commissioner found it would be of value. *See* Iowa Admin. Code r. 821—2.11 (2003) (providing that "any county commissioner may cause production of any approved voter registration application in a language other than English if the

commissioner determines that such a form would be of value in the commissioner's county").

In 2007, ten petitioners brought suit to challenge the provision of voter registration forms in languages other than English: U.S. Representative Steve King; the Jefferson, Montgomery, Calhoun, and Buena Vista County Auditors; three Iowa state legislators; U.S. English Only, Inc.; and a private citizen. *King*, slip op. at 4–5. They sued Mauro, in his capacity as Iowa Secretary of State and as Chairperson of the Iowa Voter Registration Commission, and the Iowa Voter Registration Commission. *Id.* at 1. The petitioners alleged that Secretaries of State Culver and Mauro's provision of voter registration forms in languages other than English violated the Act. *Id.* at 3–4. They also alleged that Iowa Administrative Code rule 821—2.11 violated the Act. *Id.* at 1–2. The petitioners sought a permanent injunction to prevent the provision and use of voter registration forms in languages other than English and a declaration that rule 821—2.11 was unlawful. *Id.*

The district court dismissed the claims of everyone but the county auditors. *Id.* at 16. The court concluded that the non-auditors lacked standing to challenge the secretary of state's provision of voter registration forms in languages other than English and lacked standing to challenge the legality of Iowa Administrative Code rule 821—2.11. *Id.* The court held the non-auditors lacked taxpayer standing because they could not show any direct impact on the amount of taxes they paid. *Id.* at 11. The court also rejected the petitioners' arguments that, as citizens, they had a legal right to seek an interpretation of the law regulating only government officials and had a legal right to sue the government to enforce their interpretation of the law. *See id.* at 11–14. The district court reasoned that individuals who assert only a generalized grievance

about the legality of governmental conduct lack standing. *Id.* at 12. A generalized grievance regarding the legality of governmental conduct, the district court concluded, was not a legally cognizable injury capable of judicial redress. *Id.* at 12–13.

The district court reached a different decision with respect to the county auditor petitioners. *See id.* at 14–16. Unlike the other petitioners, the district court explained that the Act regulates the conduct of the county auditors as government officials. *Id.* at 16. As regulated parties, the court concluded the county auditors had standing to seek a judicial determination as to whether they had to accept voter registration forms in languages other than English. *Id.* The court reasoned that the auditors had standing to request that determination because the secretary of state, as the state commissioner of elections, had taken the position that the county auditors had to do so. *Id.*

Having concluded that the regulated county auditors had standing to sue, the district court ruled in their favor on the merits. *See id.* at 31. The court reasoned that the Act unambiguously required all official government documents to be in English. *Id.* at 19. The district court rejected the secretary's argument that voter registration forms fell within any of the statutory exceptions raised by the secretary. *See id.* at 20–22. The court then addressed the constitutionality of the law as interpreted by the secretary. It reasoned that "the State of Iowa may control its message by requiring that its official documents be printed only in the English language." *Id.* at 29. Because the State could control its own speech in government documents, "the Act's prohibition on the use of non-English languages in official government documents [was] not unconstitutional." *Id.* After reaching the conclusion that the law was not unconstitutional, the court also addressed the right to vote. It noted that language barriers could "serve as an

impediment to voting." *Id.* The court added that the rights exception in the Act "might justify the use of non-English voter registration forms." *Id.* However, the secretary never raised that argument in the case, and the district court declined to rule on the issue. *Id.* at 30. Accordingly, the court enjoined the Iowa Secretary of State and the Iowa Voter Registration Commission "from using languages other than English in the official voter registration forms of this state." *Id.* at 31. The court also declared Iowa Administrative Code rule 821—2.11 void. *Id.* The decree was entered in 2008. No appeal was taken from that decision.

After the injunction was issued, the voter registration commission rescinded the regulations allowing the provision of voter registration forms in languages other than English. In addition, the secretary of state ceased providing any voting materials in languages other than English. This includes voter registration forms, absentee ballot applications, and ballots.

B.

With that background, we turn to the present case. The summary judgment record shows the following. LULAC is the largest and oldest Latino civil rights organization in the United States. It has approximately 150,000 members in the United States and Puerto Rico and more than 600 members in Iowa. According to the petition, LULAC's mission is to advance the economic condition, educational attainment, political influence, health, housing, and civil rights of all Hispanic nationality groups through community-based programs.

In July 2021, LULAC requested Iowa Secretary of State Paul Pate to issue a declaratory order providing guidance on the use of voting materials in Spanish. The record contains a letter from the secretary of state's lawyer sent in response to LULAC's request. It succinctly responded that the *King* injunction "prevents the dissemination of official voter registration forms for this state in languages

other than English." LULAC did not file any administrative appeal from that decision.

In October, LULAC filed this suit against Secretary Pate, in his official capacity; the Iowa Voter Registration Commission; and the Buena Vista, Calhoun, Jefferson, and Montgomery County Auditors (for ease of reading, we refer to the respondents collectively as "the secretary"). LULAC sought a declaratory judgment that voting materials—such as ballots, registration forms, voting notices, instructions, and similar items—were essential to secure the fundamental right to vote and thus fell within the rights exception to the Act. *See* Iowa Code § 1.18(5)(*h*) (2021). LULAC also sought to dissolve the injunction issued in *King*. LULAC argued the injunction was improper because the provision and use of non-English voting materials fell within the rights exception.

Following discovery and motion practice, the secretary moved for summary judgment. The secretary argued that LULAC's petition was procedurally improper for several reasons. He contended there was no authority to allow LULAC to file a new petition to collaterally attack and dissolve a permanent injunction in a different case in which LULAC was not a party. The secretary added that even if LULAC could challenge the *King* injunction, there were no grounds for doing so. To dissolve or modify a permanent injunction, a party must establish a substantial change in the facts or law and there has been no substantial change in the facts or law since the *King* injunction. The secretary also argued issue preclusion barred relitigating the issues decided in the prior case. Additionally, the secretary challenged LULAC's standing to pursue this litigation. In essence, the secretary argued that LULAC sought an interpretation of the Act on behalf of the regulated government officials and not to resolve any legal injury to LULAC capable of redress by a court. Finally, the secretary argued

LULAC's interpretation of the Act was incorrect. In the secretary's view, the Act required all voting materials to be provided in English, and the rights exception was not applicable here.

LULAC resisted the motion and filed its own motion for summary judgment. It argued that this suit was procedurally proper. In LULAC's view, Iowa Rule of Civil Procedure 1.1510 authorized it to file a new suit to dissolve a permanent injunction issued in a prior case. LULAC also claimed that the suit was not barred for any other reason and that it had standing to bring this suit. LULAC asserted it had organizational standing to raise an alleged injury to the organization. It did not assert that it had associational standing to raise an alleged injury to its members. LULAC explained that the *King* injunction impaired its "voter mobilization and registration efforts" because county officials believed they could not prepare voter registration or absentee ballot application forms in languages other than English. LULAC alleged that it was injured in fact because it had to "divert[] volunteer and staff time from other mission-critical programs" and incur "additional monetary cost of mailing materials." In sum, *King*'s interpretation of the Act and injunction "drain[ed] LULAC's resources and significant[ly] hamper[ed] its mission."

In support of its motion for summary judgment, LULAC provided supporting affidavits and deposition testimony. An affidavit from Linn County Auditor Joel Miller stated that "[i]f a court ruled that [the Act] did not apply to some or all voting materials, I would provide and accept those voting materials in languages other than English." The deposition testimony of Buena Vista County Auditor Sue Lloyd, a respondent in this case, noted that Buena Vista County provided voting materials in languages other than English prior to the

*King* injunction and that her office would have continued providing voting materials in Spanish but for the *King* injunction.

The district court granted LULAC's motion. It held that the procedure was proper and LULAC had standing. On the merits, the district court held that voting is a right guaranteed by the Federal and State Constitutions and that voting materials were "a use of language that is required by or necessary to secure" that right. It concluded that dissolution of the *King* injunction "would likely result in some number of counties providing and accepting voting materials" in other languages. The court dissolved the *King* injunction and scheduled a hearing to consider LULAC's request for declaratory judgment. Following the hearing, the district court granted LULAC's request for declaratory relief. The court held that the Act "does not apply to voting materials, including ballots, registration and voting notices, forms, instructions, and other materials and information related to the electoral process."

## II.

The secretary raises several arguments on appeal. He contends LULAC cannot collaterally attack the *King* injunction in the absence of a substantial change in the facts or law. He also contends LULAC lacks standing. Finally, the secretary argues that the provision and use of voting materials in languages other than English are not necessary to secure the right to vote and that voting materials thus do not fall within the rights exception in the Act. We limit our discussion to the question of standing because this case can be resolved on that ground alone.

## A.

"Standing refers to a party's right to bring a legal action." *Planned Parenthood of the Heartland, Inc. v. Reynolds*, 9 N.W.3d 37, 53 (Iowa 2024). In

Iowa, standing is "a self-imposed rule of judicial restraint" that courts use to police the boundaries between the judicial department and the legislative and executive departments. *Kline v. SouthGate Prop. Mgmt., LLC*, 895 N.W.2d 429, 437 (Iowa 2017). The standing doctrine arises out of the limited nature of the judicial power. The judicial power, generally, "is the power to decide and pronounce a judgment and carry it into effect." *Klouda v. Sixth Jud. Dist. Dep't of Corr. Servs.*, 642 N.W.2d 255, 261 (Iowa 2002). A "judgment" is the final judicial act that determines the rights, liabilities, and obligations of the parties before the court. *See* Iowa R. Civ. P. 1.951 (defining "judgment" as "[e]very final adjudication of any of the rights of the parties in an action"); *Giltner v. Stark*, 252 N.W.2d 743, 745–46 (Iowa 1977) (stating that a "judgment operates as the 'judicial act which settles the issues, fixes the rights and liabilities of the parties and determines the proceeding'" (quoting 49 C.J.S. *Judgments* § 2, at 26)); *Van Gorden v. Schuller*, 185 N.W. 604, 606 (Iowa 1921) (stating that a decree is the "final pronouncement which adjudicates and determines the issues in the case and defines and settles the rights and interests of the parties so far as they relate to the subject-matter of the controversy"). The standing doctrine helps ensure that the judicial department limits itself to deciding cases, not political controversies, and entering only those judgments or decrees consistent with the judicial power.

Our cases provide that a party must satisfy two requirements to have standing to sue. First, the wrong alleged must produce a "legally cognizable injury." *Hunter Three Farms, LLC v. Hunter*, 18 N.W.3d 1, 5 (Iowa 2025) (quoting *Citizens for Responsible Choices v. City of Shenandoah*, 686 N.W.2d 470, 475 (Iowa 2004)). Second, the party must be "among those who have sustained" the legally cognizable injury. *Id.* (quoting *Citizens for Responsible Choices*,

686 N.W.2d at 475). Whether a party has suffered a legally cognizable injury is the overarching question in the standing inquiry. *See State v. Dudley*, 766 N.W.2d 606, 626 (Iowa 2009) (concluding litigant lacked standing because there was no legally cognizable injury); *Citizens for Responsible Choices*, 686 N.W.2d at 475 (discussing legally cognizable injury); *Iowa C.L. Union v. Critelli*, 244 N.W.2d 564, 567 (Iowa 1976) (en banc) (stating that standing "depends on whether, if the wrong alleged does produce a legally cognizable injury, they are among those who have sustained it"); *see also Sons of Confederate Veterans v. Henry Cnty. Bd. of Comm'rs*, 880 S.E.2d 168, 171 (Ga. 2022) (stating that a party has standing to invoke the court's judicial power only when the party has "a cognizable injury that can be redressed by a judicial decision"); *Dus v. Town of Hancock*, No. 17–P–487, 2017 WL 6459666, at *2 (Mass. App. Ct. Dec. 19, 2017) (" 'Standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy' but rather by whether the plaintiff has a 'legally cognizable injury.' " (quoting *Enos v. Sec. of Env't Affs.*, 731 N.E.2d 525, 528, 531 (Mass. 2000))).

Whether a party has suffered a legally cognizable injury depends on the relationship between the injury asserted and the substantive law. As the Supreme Court explained, "Standing does not refer simply to a party's capacity to appear in court. Rather, standing is gauged by the specific common-law, statutory or constitutional claims that a party presents." *Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 77 (1991). Standing requires an analysis of "whether the particular plaintiff is entitled to an adjudication *of the particular claims asserted.*" *Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)).

Because the standing doctrine is plaintiff-specific and claim-specific, even when two parties suffer the same injury in fact they both may not have standing to sue. To develop this point further, consider the following examples:

> First, imagine a young woman who is seriously concerned about the federal deficit—she is so distraught, in fact, that every night she tosses and turns, unable to sleep. She decides to buy sleeping pills to help herself get some rest. After weeks of suffering, she sues to enjoin Congress from passing any additional economic-stimulus legislation. Next, imagine a young homeowner whose neighbor keeps a pack of huskies in his backyard. The dogs howl all night, every night. Our sleepless homeowner likewise buys medication to help himself get some rest. After weeks of suffering, he sues his neighbor to abate the nuisance.

*Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1130 (11th Cir. 2021) (Newsom, J., concurring).

Most would conclude that only one of these parties has standing to sue even though each suffered the same injury in fact. Most would conclude the plaintiff seeking to enjoin the government from spending more money lacks standing to sue but the plaintiff seeking to abate the nuisance has standing to sue. The reason is not that the first plaintiff's injuries are less real than the second plaintiff's injuries. The reason is that the first plaintiff "hasn't suffered any violation of her legal rights, so she hasn't suffered any legally cognizable injury." *Id.* at 1131. In contrast, the "aggrieved homeowner's legal rights have been violated, and he has a remedy by which to vindicate them—a common-law cause of action to abate a private nuisance." *Id.* As the examples illustrate, whether a party has suffered a legally cognizable injury and has standing "really just boils down to the question of whether [the party] has a cause of action—whether [the party's] legal rights have been infringed and whether the positive law authorizes him to sue for that infringement." *Id.*

As the example also illustrates, contestation of a party's standing to sue ordinarily arises only in public law cases. In the typical case involving only private law, standing is so clear that it is never contested. *See Hanes v. Merrill*, 384 So. 3d 616, 625–27 (Ala. 2023) (Parker, C.J., concurring in part and concurring in the result) ("What this means, practically, is that standing should not be an independent inquiry in private-right cases; instead, a court should ask solely whether the plaintiff has a cause of action."). For example, in a motor vehicle injury case, the plaintiff may assert a claim for negligence, a recognized cause of action, to recover damages for a physical injury. Standing is clear in that private law case. In a public law case like this one, however, the standing determination is less clear.

While the determination of standing may be less clear in a public law case, the requirement of having legal standing is nonetheless absolute. In *Iowa Life Ins. v. Board of Sup'rs of Black Hawk County*, 180 N.W. 721 (Iowa 1921), the litigant, a county and not a taxpayer, challenged the constitutionality of a tax law. *Id.* at 721–22. This court asked, "[W]hat standing has [the litigant] to denounce an act of the Legislature as unconstitutional by the operation of which it has never been hurt and never can be?" *Id.* at 722. This court concluded the litigant lacked standing to challenge the law because the litigant's legal rights had not been infringed: "The rule is well settled that a litigant may not attack a statute as unconstitutional unless he can show that its enforcement would be an infringement upon *his rights*." *Id.* at 722–23 (emphasis added). This court explained that "[t]he authorities on this proposition [were] abundant and uniform." *Id.* at 723. Because the litigant could not "show that he has an interest in the question in that the enforcement of the law would be an infringement on *his rights*," the court determined that it was "unavoidable" the litigant lacked

standing. *Id.* (emphasis added) (quoting 6 Ruling Case Law § 87, at 89–90 (William M. McKinney & Burdett A. Rich, eds. 1915)).

As *Iowa Life Ins.* shows, the standing doctrine still requires a litigant in a public law case to assert a legally cognizable injury—that is, the litigant must assert a violation or threatened violation of the litigant's rights or the violation or threatened violation of a duty owed the litigant and must show some individualized harm distinct from the general public. *See id.* at 722–23. The fact that a party may initiate public law litigation by way of an action for declaratory judgment or injunctive relief rather than an action for monetary damages does not eliminate or lessen the necessity of that party asserting a legally cognizable injury. Iowa Rule of Civil Procedure 1.1101 allows for a declaratory judgment action only to "declare rights, status, and other legal relations." It does not "authorize advisory opinions." *Id.* r. 1.1101 official cmt. "The mere filing of a declaratory judgment action does not, in and of itself, create a justiciable controversy. This is because the declaratory judgment rules do not create substantive rights; instead, they merely provide a mechanism to secure judicial relief in an expeditious manner." *Greenbriar Grp., L.L.C. v. Haines*, 854 N.W.2d 46, 50 (Iowa Ct. App. 2014).

To help suss out whether a party in a public law case has standing, our cases have followed the Supreme Court's lead and focused on whether a party was "injuriously affected." *LS Power Midcontinent, LLC v. State*, 988 N.W.2d 316, 329 (Iowa 2023) (quoting *DuTrac Cmty. Credit Union v. Hefel*, 893 N.W.2d 282, 289 (Iowa 2017)). Our cases provide that a party can establish it was injuriously affected by establishing "an injury in fact that is fairly traceable to the defendant's conduct [that] is likely to be remedied by a favorable decision." *Id.* at 329–30. "[T]he injury cannot be 'conjectural' or 'hypothetical' but must be

'concrete' and 'actual or imminent.' " *Id.* at 330 (alteration in original) (quoting *DuTrac Cmty. Credit Union*, 893 N.W.2d at 289). To demonstrate that an injury can be remedied by a favorable decision, a party needs to show the court can enter a judgment that can—in a nonspeculative fashion—redress the party's injury. *See Iowa Citizens for Cmty. Improvement v. State*, 962 N.W.2d 780, 791–92 (Iowa 2021). "To demonstrate sufficient imminence, '[o]nly a likelihood or possibility of injury need be shown'; '[a] party need not demonstrate injury will accrue with certainty, or already has accrued.' " *LS Power*, 988 N.W.2d at 330 (alterations in original) (quoting *Iowa Bankers Ass'n v. Iowa Credit Union Dep't*, 335 N.W.2d 439, 445 (Iowa 1983)). Whether an injury is conjectural, hypothetical, speculative, concrete, actual, imminent, traceable, redressable, etc., are all merely different standards for assessing whether an injury is legally cognizable by a court exercising its limited constitutional authority.

However a suit is initiated, and whatever relief a litigant seeks, the standing doctrine limits the judiciary to the exercise of its constitutional power of deciding cases capable of judicial redress by the entry of a judgment within the bounds of the judicial power. *See* John G. Roberts Jr., *Article III Limits on Statutory Standing*, 42 Duke L.J. 1219, 1229 (1993) ("By properly contenting itself with the decision of actual cases or controversies at the instance of someone suffering distinct and palpable injury, the judiciary leaves for the political branches the generalized grievances that are their responsibility under the Constitution."). The doctrine prevents the judiciary from the de facto exercise of the constitutional duties of the other departments of the government in making and executing the law. *See Allen*, 468 U.S. at 752 ("[S]tanding is built on a single basic idea—the idea of separation of powers."). Standing ensures "that the branch of government with the ultimate responsibility to decide the [legality] of

the actions of the other two branches of government should only exercise that power sparingly and in a manner that does not unnecessarily interfere with the policy and executory functions of the two other properly elected branches of government." *Godfrey v. State,* 752 N.W.2d 413, 425 (Iowa 2008).

## B.

To assess whether LULAC has asserted a legally cognizable injury in this case, it is first necessary to determine the legal effect of the *King* injunction and what injury, if any, LULAC suffered from the *King* injunction.

Generally, a judgment or decree is binding only upon the parties to the suit. *See Hawkeye Life Ins. v. Valley-Des Moines Co.,* 260 N.W. 669, 672 (Iowa 1935) ("It is also settled that in this jurisdiction, as well as all others, the general rule is that where a person is not made a party to an action the decree entered therein is not binding on him."). The legal effect of a judgment or decree does not change merely because the suit involves public law. In a judgment or decree, a court does not make general policy pronouncements, strike down laws, or enjoin laws. Instead, a court holds that a challenged law cannot be applied with respect to a particular party in a particular case, and the court may enjoin or compel a particular government official from taking certain actions with respect to the party or parties in that case. As Alexander Hamilton explained, courts are no threat to "the general liberty of the people" because courts only adjudicate the "rights of individuals." *The Federalist No. 78,* at 394, 396 (Alexander Hamilton) (Bantam Classic ed. 1982). While a judgment or decree, and the accompanying opinion or order, might have stare decisis implications that dictate the results in similar cases, a judgment or decree generally has no legal effect on nonparties to the litigation, strictly speaking.

Properly understood, then, the judgment in *King* had no effect on LULAC's rights, status, or legal relations. *King* enjoined only the Iowa Secretary of State, in his official capacity, and the Iowa Voter Registration Commission from using languages other than English in the official voter registration forms of this state. *See* slip op. at 31. LULAC's rights, status, and legal relations were not adjudicated in the *King* case, and any effects of the prior litigation on LULAC were merely incidental.

C.

Although LULAC recognizes that its legal rights, status, and legal relations were not adjudicated in *King*, it nonetheless contends that it has standing to challenge the *King* injunction, Secretary Pate's current interpretation of the law, and Secretary Pate's decision to not contest the *King* injunction. LULAC identifies two injuries it contends are sufficient to support standing. We discuss each below, and we conclude that neither of the identified injuries are legally cognizable injuries sufficient to support standing.

1.

LULAC first contends that it has standing because "LULAC and the Secretary presently disagree over the reach of the English-Only Law." In LULAC's view, "the Secretary's interpretation is wrong and cannot be reconciled with the text of the Rights Exception." LULAC asks us to direct Secretary Pate to administer the law as LULAC wishes and to allow county officials to have the discretion to administer the law as LULAC wishes. In effect, LULAC is asking the judiciary to exercise the executive functions of the government at LULAC's behest. This the court cannot do.

A litigant's general interest in the proper interpretation and enforcement of the law is not a cognizable injury sufficient to support standing to sue. *See*

*Godfrey*, 752 N.W.2d at 423–24 ("A general interest shared by all citizens in making sure government acts legally is normally insufficient to support standing . . . ."); *Reynolds v. Dittmer*, 312 N.W.2d 75, 77–78 (Iowa Ct. App. 1981) (stating that persons with only a general interest in the interpretation of the law lack standing). Nor is a litigant's mere disagreement with a government official's interpretation of the law a cognizable legal injury. If that alleged injury were sufficient to establish standing, the administration of government would effectively be transferred from the executive department to the judicial department at the behest of private litigants. *See* Roberts Jr., 42 Duke L.J. at 1230 ("The Article III standing requirement that the judiciary act only at the behest of a plaintiff suffering injury in fact, however, ensures that the court is carrying out its function of deciding a case or controversy, rather than fulfilling the *executive*'s responsibility of taking care that the laws be faithfully executed.").

Further, and related, LULAC's alleged injury is not redressable. *See Iowa Citizens for Cmty. Improvement*, 962 N.W.2d at 791 (stating that redressability is part of the standing inquiry). LULAC's theory of injury and relief is too attenuated. Recall that the Act prohibits the provision of certain government documents in languages other than English. Iowa Code § 1.18(3). Lifting the *King* injunction would not require the secretary of state to provide voting materials in languages other than English. Further, lifting the *King* injunction would not prohibit the secretary from exercising his discretion to continue to prohibit county auditors from providing voting materials in languages other than English. In other words, LULAC's claimed injury would only be capable of redress if the secretary agreed with LULAC and changed his current position or if LULAC filed a subsequent suit to compel the secretary to provide voting materials in languages other than English. This contingent, attenuated theory of causation

and redressability is insufficient to establish standing. *See Iowa Citizens for Cmty. Improvement*, 962 N.W.2d at 791–92.

LULAC stands in the same position as the non-county auditors in the *King* case LULAC now challenges. Recall that the district court in that case dismissed all petitioners except the county auditors for lack of standing. *King,* slip op. at 16. The district court rejected the non-county auditor petitioners' argument that they had a legal right to seek an interpretation of the law regulating government officials and had a legal right to sue the government to enforce their interpretation of the law. *Id.* at 13. The court in *King* reasoned that individuals who assert only a generalized grievance about a government official's execution of the law lack standing. *Id.* at 14. The same rationale applies to LULAC here.

## 2.

LULAC maintains it has standing because the *King* injunction, Secretary Pate's interpretation of the law, and Secretary Pate's decision not to challenge the *King* injunction causes LULAC concrete injury. Specifically, LULAC is forced to translate voter registration materials without assistance from government officials. LULAC claims these extra efforts divert LULAC's resources from other activities related to voter registration and outreach. We conclude that a generalized assertion of resource diversion for an organization not regulated by the law at issue is not a legally cognizable injury sufficient to support standing.

The Supreme Court recently addressed the issue of organizational standing of nonregulated entities in *Food & Drug Administration v. Alliance for Hippocratic Medicine,* 602 U.S. 367 (2024). "In 2000, [the Food and Drug Administration] approved a new drug application for mifepristone tablets marketed under the brand name Mifeprex. FDA approved Mifeprex for use to terminate pregnancies, but only up to seven weeks of pregnancy." *Id.* at 375. The

FDA later approved a supplemental new drug application for mifepristone that relaxed some of the restrictions the FDA had imposed on use of the drug. *Id.* Among other things, the FDA "deemed Mifeprex safe to terminate pregnancies up to 10 weeks rather than 7 weeks," and the "FDA allowed healthcare providers such as nurse practitioners to prescribe Mifeprex." *Id.* at 375–76. Six years later, the FDA again loosened the restrictions for the prescription of the drug, eliminating a requirement that the patient have an in-person visit to a healthcare provider. *Id.* at 376. Four pro-life medical associations and several doctors sued the FDA, arguing that the FDA must "rescind approval of mifepristone" or rescind the later actions lessening the restrictions on mifepristone's use. *Id.* at 377. The FDA argued the plaintiffs lacked standing to challenge the FDA's actions. *See id.*

In addressing the standing question, the Supreme Court began with an explanation of the standing doctrine. The Court explained that the standing doctrine limits the role of the courts in a system of separated powers. *Id.* at 378. Standing ensures that "courts decide litigants' *legal rights* in specific cases" rather than "opin[ing] on *legal issues* in response to citizens who might 'roam the country in search of governmental wrongdoing.' " *Id.* at 379 (emphases added) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 487 (1982)). Requiring that parties suffer a legally cognizable injury prevents "courts from becoming a 'vehicle for the vindication of the value interests of concerned bystanders.' " *Id.* at 382 (quoting *Allen*, 468 U.S. at 756). The Court further explained that "[v]indicating 'the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of' " the other branches of government. *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 576 (1992)).

After discussing the general purposes of the standing doctrine, the Court concluded that the plaintiffs lacked standing. *Id.* at 385–86. The Court drew a distinction between regulated and unregulated parties. *Id.* at 385 (explaining that the "FDA has not required the plaintiffs to do anything or to refrain from doing anything"). The Court concluded that the medical associations were unregulated parties challenging the FDA's regulation of others. *Id.* When a party challenges the government's regulation or lack of regulation of someone else, then standing is "substantially more difficult to establish." *Id.* at 382 (quoting *Lujan*, 504 U.S. at 562).

The Court rejected the medical associations' argument that they had standing because the challenged laws impaired their ability to provide services and advance their organizational mission. *Id.* at 394. "That argument does not work to demonstrate standing." *Id.* Instead, "[a] plaintiff must show 'far more than simply a setback to the organization's abstract social interests.'" *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

The Court also rejected the medical associations' claim that they had suffered a cognizable legal injury by incurring expenses in opposing and responding to the challenged regulations. *Id.* As the Court explained, an organization "cannot spend its way into standing simply by expending money" in response to the challenged law. *Id.* The Court rejected the contention that "standing exists when an organization diverts its resources in response to a defendant's actions." *Id.* at 395. If that were a theory of standing, "all the organizations in America would have standing to challenge almost every [law] that they dislike, provided they spend a single dollar opposing those policies." *Id.*

While we are not bound to follow the Supreme Court's precedents on standing, *see Iowa Citizens for Cmty. Improvement*, 962 N.W.2d at 790–91

(noting federal standing authorities are persuasive), we think *Hippocratic Medicine* is instructive here. Like the medical associations in *Hippocratic Medicine*, LULAC is not regulated by the challenged law. Like the medical associations in *Hippocratic Medicine*, LULAC has an interest in the subject matter of the Act, but it has not suffered any infringement of its rights, status, or legal relations. *See DuTrac Cmty. Credit Union*, 893 N.W.2d at 289 (requiring litigants to allege a specific personal or legal injury that is different from the general population); *Alons v. Iowa Dist. Ct.*, 698 N.W.2d 858, 869 (Iowa 2005) ("The claimed nonobservance of the law . . . affects only the generalized interest of all citizens, and such an injury is abstract in nature, which is not sufficient for standing."); *Iowa Life Ins.*, 180 N.W. at 721–22 (concluding that the litigant lacked standing when it could not show "the enforcement of the law would be an infringement on *his rights*" (emphasis added)). Like the medical associations in *Hippocratic Medicine*, LULAC expended its own resources in response to the government's interpretation and enforcement of the law, but "[a]n organization cannot manufacture its own standing in that way." 602 U.S. at 394. While spending resources in response to a law is certainly, in some sense, an injury in fact, it is not a legally cognizable injury. And, like the medical associations in *Hippocratic Medicine*, LULAC's spending is purely discretionary. *See id.* The Act and the *King* injunction do not prohibit LULAC from doing anything and do not require LULAC to do anything.

We also think our conclusion that LULAC lacks standing is supported by voting and election cases post-*Hippocratic Medicine*. In *Tennessee Conference of the National Ass'n for the Advancement of Colored People v. Lee*, the NAACP challenged a felon documentation policy election officials used to distinguish between felons who had the right to vote and those who did not. 105 F.4th 888,

890 (6th Cir. 2024) (per curiam). The Sixth Circuit stayed a preliminary injunction against application of the policy, in part, because it concluded that the organization would likely lack standing. *Id.* The Sixth Circuit explained that *Hippocratic Medicine* changed the law and cast serious doubt that "pocketbook injuries" like being forced to "devote extra time and expense" in response to a law regulating others could establish standing. *Id.* at 905. The court also explained that the plaintiff likely lacked standing because the summary judgment record failed to "identify 'specific facts, as opposed to general allegations'" to prove the alleged injury. *Id.* (quoting *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020)). Like the plaintiff in *Tennessee Conference*, LULAC only makes general allegations in support of its claimed resource-diversion theory of standing.

In *Citizens Project v. City of Colorado Springs*, four nonprofit organizations brought an action for declaratory and injunctive relief challenging an election law that required municipal elections to be held in April of odd years as opposed to November of even years. No. 1:22–cv–01365–SKC–MDB, 2024 WL 3345229, at *1 (D. Colo. July 9, 2024). The district court dismissed their claims for lack of standing. *Id.* at *7. Like LULAC here, the plaintiffs asserted a resources-diversion theory of standing, including "things like diverting time, money, and resources from their other civic or voter engagement activities and their day-to-day operations." *Id.* at *4. The district court concluded that these claimed injuries were indistinguishable from those asserted in and rejected in *Hippocratic Medicine. See id.* "The fact that Plaintiffs are dedicated to serving voters is not enough to confer organizational standing." *Id.* at *7. The court also suggested that the organizations' claims to standing were fabricated. *Id.* at *5. The challenged law had been in place for a long time, but the plaintiff organizations

had never challenged the law. *See id.* That "chronology demonstrate[d] the abstract nature of Plaintiffs' claimed injuries, which seem[ed] to be supported only by their decision to now oppose" the law. *Id.* The same is true here. The *King* injunction was entered in 2008, but LULAC sat by and did not challenge the injunction for thirteen years.

In *Wisconsin Voter Alliance v. Millis*, the plaintiff voter organization brought a suit against the members of the Wisconsin Elections Commission. ___ F. Supp. 3d ___, ___, 2025 WL 357775, at *1 (E.D. Wis. Jan. 31, 2025). The district court dismissed the complaint for lack of standing. *Id.* at *4–5. Relying on *Hippocratic Medicine*, the district court rejected the organization's argument that the commission's failure to act interfered with the organization's "core political activities" and forced it to "divert resources" from those activities. *Id.* at *5. The court also rejected the organization's argument that if it did "not have standing, then who does?" *Id.* The district court explained that the Supreme Court " 'has long rejected that kind of "if not us, who?" argument as a basis for standing.' " *Id.* (quoting *Hippocratic Med.*, 602 U.S. at 396). "For '[t]he Framers of the Constitution did not "set up something in the nature of an Athenian democracy or a New England town meeting to oversee the conduct of the . . . Government by means of lawsuits in federal courts." ' " *Id.* (alteration and omission in original) (quoting *Hippocratic Med.*, 602 U.S. at 396).

All of these observations apply here. In our democratic republic, the people decide matters of public policy, subject to constitutional limitations previously imposed by the people. State court judges have no authority to serve as the general overseers of the government at the behest of public law litigants who have suffered no legally cognizable injury. LULAC's expenditure of funds and other resources in response to the injunction and the secretary's interpretation

of the law makes LULAC like the medical associations in *Hippocratic Medicine*, *see* 602 U.S. at 385–86, the voting organizations in the cases discussed above, the non-county-auditors in the *King* case, and the sleepless litigant who wanted to challenge the government's spending, *see City of Hallandale Beach*, 996 F.3d at 1130 (Newsom, J., concurring). *Cf. League of Women Voters of Ohio v. LaRose*, 741 F. Supp. 3d 694, 707 n.3 (N.D. Ohio 2024) ("Ohio law now forbids LWVO members from assisting disabled voters and its members could be subject to felony criminal charges for violations of the Challenged Ohio Law. LWVO's injury in this case is direct.").

An organization's expenditure of resources in response to a law that does not violate, regulate, or determine the litigant's rights, status, or legal relations is not a legally cognizable injury. Instead, it is *damnum absque injuria. See Bader v. Iowa Metro. Sewer Co.*, 178 N.W.2d 305, 307–08 (Iowa 1970) (stating that when a party has suffered an injury in fact but "without injury, in the legal sense," the injury is *damnum absque injuria* (quoting *Gunther v. E.I. Du Pont De Nemours & Co.*, 157 F. Supp. 25, 33 (N.D. W. Va. 1957))). A party is not "entitled to maintain [an] action" where the injury is "damnum absque injuria." *Warren v. Iowa State Highway Comm'n*, 93 N.W.2d 60, 67–68 (Iowa 1958); *see also Wasserman v. Franklin County*, 911 S.E.2d 583, 593 (Ga. 2025) ("Second, although plaintiffs could maintain an action by asserting a violation of their rights without asserting actual damage, the opposite—asserting damage without asserting a violation of their rights—would not suffice. This was the meaning of the common law principle that no action would lie for *damnum absque injuria,* or 'damage without injury.' ").

III.

For these reasons, we conclude that LULAC has not asserted a legally cognizable injury capable of judicial redress consistent with the exercise of the judicial power. LULAC thus lacks standing to bring this suit. The judgment of the district court is reversed. This matter is remanded for the entry of an order of dismissal.

**Reversed and Case Remanded.**

All justices concur except Waterman and Mansfield, JJ., who take no part.